IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| GEORGE E. MORRISON, III, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 3:13CV660–HEH |
| | ) |
| CARL ERIC FLY, Sr., *et al.*, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**
(Denying Defendants' Motion to Dismiss)

THIS MATTER is before the Court on Defendants' Motion to Dismiss (ECF No. 8) ("Motion"), filed on February 5, 2014. Both parties have filed memoranda of law in support of their respective positions. The Court will dispense with oral argument because the facts and legal contentions have been adequately presented and oral argument would not aid in the decisional process. For the reasons set forth herein, Defendants' Motion will be denied.

I.     BACKGROUND

As required by Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court assumes Plaintiff's well-pleaded allegations to be true, and views all facts in the light most favorable to him. *T.G. Slater & Son v. Donald P. & Patricia A. Brennan, LLC*, 385 F.3d 836, 841 (4th Cir. 2004) (citing *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). Viewed through this lens, the Court finds the following narrative represents

the facts as presented in the Complaint. The allegations, if proven, clearly portray a course of discriminatory actions against Plaintiff.

George E. Morrison, III ("Morrison") is an African American male who was employed by the County of Sussex beginning on January 29, 2009, and ending with his suspension on July 20, 2012, and subsequent termination on July 23, 2013. (First Am. Compl. ¶¶ 2, 16, ECF No. 3.) He was hired to serve as the Deputy County Administrator and the Director of Economic Development. (*Id.* at ¶ 19.) Defendant Carl Eric Fly, Sr. was a member of the County Board of Supervisors at the time of Morrison's hiring. Though he was a member of the Board's Personnel Committee, Fly did not attend either of Morrison's interviews nor had he met Morrison before joining the unanimous Board of Supervisors' vote to approve Morrison's hiring. (*Id.*)

Morrison's hiring was immediately met with disdain once members of the Board, including Fly, discovered his race. (*Id.* at ¶¶ 20-24.) At a board retreat, Fly conducted a closed session of the Board in an attempt to remove Morrison. (*Id.* at ¶ 22.) Later, in February, 2009, County Attorney Henry Thompson allegedly overheard Fly and other Board members' discussion centered on how to remove Morrison from his position. (*Id.* at ¶ 23.) The discussion also touched on ways to remove other senior African American employees of the County. (*Id.* at ¶¶ 23-24.) Fly purportedly met with fellow members of the Board on several occasions to discuss ending Morrison's employment. (*Id.* at ¶ 25.) Even though Morrison resisted all efforts to interfere with his employment, he received a "superior" evaluation in a performance review on August 11, 2009. (*Id.* at ¶¶ 26-27.)

Within a year of his hiring, in August, 2009, Morrison assumed the duties of Acting County Administrator on an interim basis, as well as Director of Human Resources. (*Id.* at ¶ 28.) A month later, Fly pulled Morrison aside and said, "the problem with you is that you don't trust us, you only trust those black [supervisors] down there." (*Id.* at ¶ 30.) In November, Fly threatened to make a motion to remove Morrison at the upcoming December board meeting. (*Id.* at ¶ 31.) Though he did not follow through with the motion at the closed meeting, he did categorize everything happening in the County as "purely racist." (*Id.* at ¶ 32.)

On August 19, 2010, Morrison's interim duties were formalized with his appointment as Interim County Administrator effective September 1, 2010, with salary to be determined at the next board meeting. (*Id.* at ¶ 33.) At the subsequent meeting, Morrison's salary was increased to reflect his increased responsibilities. (*Id.* at ¶ 34.) In a later interview to fill the County Administrator position on a permanent basis, Fly allegedly targeted Morrison with questions calculated to derail Morrison's candidacy. (*Id.* at ¶ 35.)

On May 5, 2011, Fly revealed to Morrison that, though he was unsure if he would seek re-election, he was intent on removing the African American County Attorney. (*Id.* at ¶ 36.) It was Fly's belief that the attorney favored the African American members of the Board in an effort to help them get re-elected. (*Id.*)

On June 16, 2011, Morrison was told that he had not been selected as the County Administrator, but instead that Defendant Thomas E. Harris ("Harris") had been chosen.

3

(*Id.* at ¶ 37.) Shortly after Harris' hiring, he purportedly informed Morrison that he had been hired to "fire the blacks in the County." (*Id.* at ¶ 41.)

On June 16, 2011, the Board reassigned Morrison to the position of Assistant County Administrator and Economic Director with a written employment contract, in contrast to his previous employment without a written contract. (*Id.* at ¶ 38.) The contract provided that Morrison would report to the Board of Supervisors and be supervised by its Chairman, and could only be discharged by the Board for cause. (*Id.* at ¶¶ 40, 58.) The contract was not ratified by the Board until October 20, 2011. (*Id.* at ¶ 42.) Fly opposed the Motion to ratify. (*Id.*) At the November 2011, board meeting, a resolution was passed to return Morrison's contract to the Personnel Committee "for modification," though it was never ultimately changed. (*Id.* at ¶¶ 42-43.) Throughout this time, Fly was communicating with other members, outside of formal board proceedings, about Morrison's employment, and, along with Harris, questioned the validity of the contract. (*Id.*) At the same time, Harris' contract was never questioned, modified, or reviewed. (*Id.* at ¶ 43.)

Defendant Alfred G. Futrell was elected to the Board in November 2011. (*Id.* at ¶ 45.) Futrell is an African American and joined three other African Americans on the Board, in addition to Fly and Defendant Raymond L. Warren, who are Caucasian. (*Id.*)

Morrison contends that a political impasse was formed when Futrell caucused with Fly and Warren. (*Id.*) Between November 2011 and June 2012, Fly, Warren, and Futrell

4

allegedly met and/or communicated on several occasions to discuss how to terminate Morrison. (*Id.* at ¶ 46.) At the same time, Harris began to undermine and circumvent Morrison while treating him negatively and selectively communicating with him. (*Id.* at ¶ 47.) According to the Complaint, Harris followed the same manner of conduct with other African American employees, in contrast to his treatment of their Caucasian colleagues. (*Id.* at ¶ 48.) Morrison continually protested the racially-based treatment, though no efforts were made to address or remedy the discrimination. (*Id.* at ¶ 59.)

On June 21, 2012, Fly moved to "terminate any and all fixed term employment contracts" with Morrison, effective June 30, 2012. (*Id.* at ¶ 52.) Fly proposed that Morrison would continue as a salaried employee but at a lower salary. (*Id.*) The motion did not obtain the required majority vote in order to pass. (*Id.*)

On July 20, 2012, Harris, accompanied by the Sheriff, came to Morrison's office and presented him with a letter indicating that he was immediately suspended. (*Id.* at ¶ 57.) The letter also advised Morrison that Harris would recommend his full termination to the Board. (*Id.*) Morrison purportedly heard the Sheriff "buzz" his Taser as Morrison packed his belongings. (*Id.*) He was then escorted from the premises. (*Id.*) All compensation and employee benefits immediately ceased. (*Id.* at ¶ 69.)

On August 16, 2012, by a vote of 3-3, the Board failed to adopt a motion to give Harris the authority to suspend Morrison and to approve Harris' recommended termination of Morrison's employment. (*Id.* at ¶ 60.) Rufus Tyler, Chairman of the

Board, sent Morrison a letter on August 17, 2012, advising him of the outcome of the vote and authorizing Morrison to return to work. (*Id.* at ¶ 61.) However, in concert with the newly hired County Attorney, Fly, Warren, Futrell, and Harris urged Tyler to send an additional letter, dated August 22, 2012, advising Morrison that a four-vote majority would be required to authorize his return to work, and as a result, Morrison must remain on unpaid suspension indefinitely. (*Id.*) Subsequently, Morrison received a letter from the County Attorney advising him that he may not attempt to return to work, and any attempts to do so would be considered trespassing. (*Id.* at ¶ 63.) Morrison made repeated demands to return to work and requested the opportunity to challenge his suspension to no avail. (*Id.* at ¶ 65.)

Morrison filed a Charge of Discrimination on July 20, 2012, with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* at ¶ 64.) Defendants were notified of the charge by October 10, 2012. (*Id.*)

Chairman Tyler resigned from the Board, allowing Fly to assume the position of Board Chairman on July 23, 2012. (*Id.* at ¶ 67.) The Board immediately passed a resolution terminating Morrison's employment contract. (*Id.*) Fly wrote Morrison a letter advising him of the termination. (*Id.* at ¶ 68.)

## II. STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952

(4th Cir. 1992) (citation omitted). The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint need not assert "detailed factual allegations," but must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* (citation omitted), to one that is "plausible on its face," *id.* at 570, rather than merely "conceivable." *Id.* In considering such a motion, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *T.G. Slater*, 385 F.3d at 841 (citation omitted).

### III. ANALYSIS

Employing the well-settled standard of review, the Court will address each argument asserted in the Motion in turn.

#### A. § 1981 and § 1983 Claims Against the County and the Supervisors in their Official Capacities

Defendants first move to dismiss the claims against the County and the Supervisors in their official capacities arising under 42 U.S.C. §§ 1981 and 1983. The parties agree that the claims against the Board members in their official capacities will be treated as claims against the County in all respects other than name. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Any liability resides with the County as the real

party in interest. *Id.* Accordingly, as this matter progresses, those claims will be discussed only with respect to the County and not the individuals. *Huggins v. Prince George's County*, 683 F.3d 525, 532 (4th Cir. 2012) (citing *Kentucky*, 473 U.S. at 166).

In order for the § 1981 and § 1983 claims to proceed, the Complaint must sufficiently allege that the employment actions in the case were carried out pursuant to the County's policies or customs. *See Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995). Liability for the County arises when the offensive acts "are taken in furtherance of some municipal 'policy or custom.'" *Milligan v. Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Furthermore, the County is responsible for the "edicts or acts" carried out by its lawmakers in furtherance of its own policy. *Id.*; *Monell*, 436 U.S. at 694. Where officials have the *de facto* force of law, their persistent practices may constitute policy or custom of the municipality. *Milligan*, 743 F.2d at 230. Further, the County may be liable not only when the conduct is officially sanctioned, but when known violative actions are condoned. *Id.*.

In the present matter, the Complaint alleges a pattern of hostility orchestrated by the County, through the actions of the individual defendants. It appears that the course of offensive acts described in the Complaint provide a plausible inference of custom or policy on behalf of the County. Over several years, there appeared to be a movement afoot to remove Morrison and other African American colleagues from their positions. Morrison was seemingly targeted as a result of the prevailing custom of racial animus. While additional evidence supporting or refuting the § 1981 and § 1983 claims may be

8

unearthed during discovery, at the pleading stage, in Counts One, Two, Three, Seven, and Eight, the Complaint sufficiently states a plausible claim to survive Rule 12(b)(6) scrutiny.

### B. Title VII Claims Against the County

Count Four presents a claim under Title VII for selective treatment, unlawful discrimination, and hostile work environment. The EEOC charge scheme under Title VII requires a strict adherence to a filing timeline. Namely, an individual has 300 days to initiate proceedings after the alleged unlawful employment practice occurred. *See* 42 U.S.C. § 2000e-5e(1). The Defendants, therefore, seek to limit the scope of events considered to support the claim to those occurring in the 300 days prior to the EEOC charge being filed.

The Supreme Court has found that the assessment of Title VII claims may include acts outside of the statutory period. *See AMTRAK v. Morgan*, 536 U.S. 101, 105 (2002). Under the continuing violation theory, as long as any singular act contributing to the hostile environment takes place within the statutory period, the earlier actions will be viewed as a series of separate but related acts and may fall within the ambit of the claim. *Id.*; *Beall v. Abbott Labs.*, 130 F.3d 614, 620 (4th Cir. 1997). While the Fourth Circuit has not set forth a specific test under the continuing violation theory, ascertaining what constitutes a continuing violation can include various factors but cannot be reduced to a simple formula because each inquiry is fact-specific. *Urda v. PetSmart, Inc.*, 854 F. Supp. 2d 359, 364 (E.D. Va. 2012).

Allegations in the Complaint include hostile actions taken against Morrison extending from the time of his initial employment by the County to his final termination. It is plausible that the composite of alleged actions, occurring both during and before the statutory period, viewed collectively, constitute a continuing violation. Accordingly, the allegations supporting the Title VII claims contained in Counts Four, Five, and Six pass muster for the purposes of the pleading stage.

### C. Legislative Immunity

Defendants also move to dismiss the claims against Board members arising under § 1981 and § 1983 based on legislative immunity. Legislators enjoy broad immunity when adopting "prospective, legislative-type rules." *Alexander v. Holden*, 66 F.3d 62, 66 (4th Cir. 1995) (citation omitted). The nature of an act determines whether it is legislative, without regard to the motive or intent of the official(s) performing it. *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998). The Fourth Circuit has recognized that targeting an individual through a personnel decision is inherently administrative, rather than legislative, and therefore does not afford immunity to decision makers. *Holden*, 66 F.3d at 67. Actions pertaining to structural and budgetary matters, by contrast, are considered legislative and raise an entitlement to immunity, but specific employment decisions do not rise to that general level. *Id.*

The alleged legislative actions of Defendants appear to fall squarely within the immunity exception articulated by the Fourth Circuit in *Holden*. Based on the allegations, the Board specifically focused its legislative actions on Morrison and his

10

employment. Therefore, the nature of the personnel decision prevents the Board members from enjoying any possible legislative immunity for their actions.

### D. Hostile Work Environment Claim against Defendants Fly and Harris

"There is no 'mathematically precise test' for determining if an environment is objectively hostile or abusive." *EEOC v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 328 (4th Cir. 2010) (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 22 (1993)). Considering "all the circumstances," the Court will consider the objective severity of the environment from the standpoint of a reasonable person. *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998) (*citing Harris*, 510 U.S. at 21, 23).

Viewing all the circumstances, it plainly appears from the Complaint that an objectively hostile and abusive environment existed, through the acts of Defendants Fly and Harris, and others. Considering the asserted allegations collectively, it is certainly plausible that a reasonable person could find the resulting environment severe. Employment under the constant direct or implied threat of termination is objectively unreasonable. Therefore, Count One sufficiently states a plausible claim against Fly and Harris to survive this stage of review. Their conduct may also be imputed, as discussed *supra*, to adequately establish a claim against the County.

### E. All Claims Against Defendants Warren and Futrell

Defendants move to dismiss each of the § 1981 and § 1983 claims against Warren and Futrell. Defendants point to this Court's decision in *Pettis v. Nottoway Cnty. Sch. Bd.*, 2013 U.S. Dist. LEXIS 84821 (E.D. Va. June 17, 2013), to support their assertion

11

that Board members should not be held individually liable for § 1981 and § 1983 claims when the Board was solely acting in concert.

The present claims, however, are distinguishable from *Pettis*, in that the Complaint contains allegations of a scheme, apart from official Board actions, carried out against Morrison. Morrison alleges that both Warren and Futrell joined Harris and Fly in meeting and communicating to effectuate Morrison's termination. The Court recognizes that these allegations are thin, at best, but sufficient, given the requirements at this stage that the Complaint be reviewed in the light most favorable to Morrison. Accordingly, Counts One, Two, Three, Seven, and Eight survive specifically with respect to Warren and Futrell.

### F. Unlawful Termination

Morrison may establish his claims of unlawful termination in two ways: first, he may proffer direct evidence of discriminatory discharge; or, he may establish a prima facie case raising the inference of discrimination. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd* 132 S. Ct. 1327 (2012). Though Morrison may ultimately marshal sufficient direct evidence to support his claims, the case may also be proven under the well-settled four-prong inferential approach requiring Morrison to show that (1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) similar employees outside of his class were treated more favorably under similar circumstances. *Id.*

At this time, direct evidence has only been alleged but not specifically proffered. Therefore, in its initial review, the Court employs the four-prong assessment framework. The Complaint lays out facts clearly establishing both that Morrison is a member of a protected class and that he suffered an adverse employment action through his termination. Morrison goes on to allege that he was performing his job duties in a satisfactory manner during the course of his only completed job evaluation, satisfying the third prong. And finally, he alleges that he, along with other African American employees, was targeted for termination though Caucasian staff members were not. These allegations suffice to advance the unlawful termination claims in Counts Two, Five, and Eight.

### G. Unlawful Retaliation

The elements of a prima facie retaliation claim are: (1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action. *Coleman*, 626 F.3d at 190. Of course the causal link must be established with sequential progression of the protected activity being followed by the adverse action. This basic element provides the basis for defendants moving to dismiss these claims.

Defendants assert that the filing of the EEOC Charge of Discrimination occurred *following* Morrison's suspension on July 20, 2012, thereby vitiating any causal connection between the adverse employment action and the protected EEOC filing. However, Defendants fail to acknowledge that the latter adverse employment action, Morrison's ultimate termination, occurred well after the Board was made aware of the

13

EEOC Charge. Therefore, it is plausible that the EEOC charge, though not the impetus for the suspension, was a deciding factor in Morrison's termination. Accordingly, Morrison states a viable claim at this stage with respect to Counts 3 and 6.

### H. Violation of First Amendment Rights

The First Amendment guarantees free speech in a public forum, but it does not guarantee access to every government property based solely on the ownership or control by the Government. *Sons of Confederate Veterans v. City of Lexington*, 722 F.3d 224, 231 (4th Cir. 2013) (citing *U.S. Postal Service v. Council of Greenburgh Civic Assns.*, 453 U.S. 114, 129 (1981)). A government may impose reasonable limits or constraints on its facilities when acting in a proprietary capacity. *United States v. Kokinda*, 497 U.S. 720, 723-26 (1990).

In the Complaint, Morrison alleges that the Defendants infringed on his Constitutional rights through prior restraint and on the basis of his presumed associations. Morrison was prohibited from entering the County Administration facility during his period of suspension. The question remains as to whether this facility qualifies as a public forum thereby guaranteeing First Amendment protections. The Court finds that while the restrictions placed on Morrison following his suspension *may* have been reasonable, the ultimate determination of the reasonableness and the scrutiny required should be left to a later point in the matter once the evidence is more fully developed. Therefore, Count Seven survives the motion.

The Constitution provides safeguards against the deprivation of property interest under the color of state law. *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). The Due Process Clause requires that the aggrieved party be afforded a timely hearing or reasonable opportunity to challenge said deprivation. *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). A deprivation hearing must be carried out in a meaningful time and manner. *Id.* Due Process therefore requires a discharged employee to have the ability to challenge the termination should he choose to do so.

The Court finds that Morrison's indefinite suspension, followed by his ultimate termination, along with the prohibition on returning to meet with administrators, without a reasonable opportunity to be heard, plausibly states a facially sufficient claim for relief. Defendants' motion, therefore, will be denied with respect to Count Eight.

## IV. CONCLUSION

Based on the foregoing analysis, the Motion to Dismiss will be denied as to all counts. An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Date: April 18, 2014
Richmond, VA